KURT ORBAN COMPANY, INC. v. UNITED STATES (No. 5166)*

United States Court of Customs and Patent Appeals, February 11, 1965

*Sharretts, Paley & Carter* (*Eugene F. Blauvelt*, of counsel) for appellant.
*John W. Douglas*, Assistant Attorney General, *Andrew P. Vance*, Chief, Customs Section (*Morris B. Braverman*, of counsel) for the United States.

[Oral argument November 2, 1964, by Mr. Blauvelt and Mr. Braverman]

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Jr., Associate Judges

RICH, Judge, delivered the opinion of the court:

This appeal is from the judgment of the United States Customs Court, Third Division, Appellate Term (A.R.D. 163), reversing the

*C.A.D. 851.

judgment of the trial judge in a reappraisement.[1] A motion for a rehearing was denied except for the correction of findings of fact which were contrary to the evidence (A.R.D. 166).

The merchandise imported was iron or steel wire. Appeals to reappraisement of two different shipments (R61/1342 and R61/5194) were consolidated for trial. They involve somewhat different facts but the legal question in each is the same. ▆▆▆ At issue is the proprietary of the addition to the ex-factory unit prices of inland freight and f.o.b. charges of $8 per metric ton in the first case and $11 per metric ton in the second case in determining export value under section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. 1401a(b)).

The single judge and the Appellate Term reached opposite results on the basis of the same evidence by reason of different conclusions as to *who* sold the goods and *where* they were sold, critical factors in applying the terms of the statute relating to price "in the principal markets of the country of exportation." The statute, section 402(b), reads:

EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

The trial judge (Reap. Dec. 10338) concluded that the factories of the sellers were the "principal markets" under the statute and that the statutory "price" was the ex-factory price. These factories from which the shipments involved were made were located in Creil in the Province of Oise and in Saucourt par Doulaincourt in the Province of Hte. Marne, both in France. The Appellate Term, on the contrary, concluded that the "principal market" was Paris, the location of a sales agency known as "SAPET", that the merchandise was sold f.o.b. Antwerp, Belgium, and that the statutory "price" included inland freight and f.o.b. charges made by SAPET. An understanding of the issue requires consideration of the involved business practices and of the position of SAPET.

The full name of SAPET is Société Anonyme pour L'Exploitation de Tréfileries (a tréfilierie is a widedrawing-mill). Affidavit evidence was given by its managing director, Marcel Seidler. SAPET is an exclusive export sales agent for six wire manufacturers and a non-exclusive agent for at least four others, all of whom are named in the affidavit. SAPET is owned by the principal mills for which it

---

[1] Only two judges participated in the decision of the Appellate term.

acts as export sales agent. It is located in Paris, France, and its stationery carries the sub-heading "Services D'Exportation" (Export Services). M. Seidler had been with SAPET for eleven years and is listed on the letter head as an "Ingénieur E.C.P." When he speaks, as he did, of "Sales and offers for sale for exportation to the United States * * * made in Paris by SAPET" we do not take him to be testifying in terms of *legal* conclusions under the law of sales but rather as speaking in the vernacular. Of course the business of SAPET, as a sales agency, was "selling" the wire of its principals but it is necessary for us, as well as the Customs Court, to look not so much at the words used by non-lawyers as at the method of doing business which they describe and to determine, according to well-established legal principles, when, where, and by whom sales were made and at what price.

The course of business described by M. Seidler, and confirmed by the testimony at trial of plaintiff's witness Ross, manager of the wire department of the importer, Kurt Orban Company, Inc., seems quite clear. Orban imports steel. SAPET represents mills making steel products, especially wire. If, for example, Orban has a call for a particular wire which a mill represented by SAPET could supply, the information is sent to SAPET by "telex" with a request to make a specific offer on behalf of a specific mill. A quotation is sent and, if it is satisfactory, Orban places an order through SAPET. The Seidler affidavit states, "no sale becomes final until it has been accepted by the particular manufacturer at his factory. All prices quoted and sales made are at an ex-factory price for the merchandise."

The next stage is an invoicing or billing procedure. When a mill makes a sale through its sales agent SAPET for export, the mill "makes out an invoice to the American purchaser showing an ex-factory unit price as well as the total price for the shipment and forwards it to SAPET. SAPET in turn prepares its invoice to the American purchaser showing exactly the same prices, description of merchandise, and total ex-factory amount as is shown on the manufacturer's invoice. SAPET, on its invoice, shows an amount for inland freight and f.o.b. charges based upon a fixed rate per metric ton."

The invoices here involved were made out as above described. They showed prices for the exported wire and they separately showed SAPET's addition to those prices for inland freight and f.o.b. charges for putting the wire aboard ship at a European port. The appraiser adopted the ex-factory prices but added to them for the purpose of fixing export value under section 402(b) the shipping charges added thereto by SAPET, expressing his appraisal in the following language:

At invoice units net packed plus item X.

In case of R61/1342, item X reads:

Inland freight and FOB Charges $8 x 15 T.
660------------------------------ $125.28.

In the case of R 61/5194, item X reads:

Inland freight and FOB Charges $11 x 2 T.
724=$29.96

As above indicated, the sole issue before us is whether these shipping charges are to be included in the statutory "export value." Whether or not they should be is a question of law. The authority principally relied on by the Appellate Term and by appellee is *United States* v. *Paul A. Straub & Co.*, 41 CCPA 209, C.A.D. 553, together with our later decision in *Albert Mottola* v. *United States*, 46 CCPA 17, C.A.D. 689, applying and construing the *Straub* case. We might also add that the *Straub* case in turn rested on *United States* v. *Heffernan Paper Co.*, 13 Ct. Cust. Appls. 593, T.D. 41454; *United States* v. *Traders Paper Co.*, 14 Ct. Cust. Appls. 293, T.D. 41909; and *United States* v. *Zellerbach Paper Co.*, 28 CCPA 303, C.A.D. 159. All five of these cases had a common factual situation. There was one price, and only one price, for the merchandise which was on an f.o.b. port of shipment basis. In other words, the single price available always included the inland freight and f.o.b. charges. Typical is the fact situation underlying the decision in *Straub*, as stated in item (8) of the stipulated facts (41 CCPA at p. 210):

That on or about the time of exportation herein, *all* sales and offers for sale of such or similar merchandise were made at Selb-Stadt, Germany [the factory location] on an F.O.B. Bremen basis and *no* sales or offers for sale were made on an at factory basis. [Our emphasis.]

We come, therefore, to the question whether there is substantial evidence in the present case to support a fact finding that we have such a situation here, or whether the evidence reasonably leads only to one conclusion, as found by the single judge in his findings of fact "6" and "7":

6. At, and prior to, the dates of exportation herein, the factories of the sellers were the principal markets for the sales of the imported merchandise.

7. At, and prior to, the dates of exportation herein, said manufacturers freely sold said merchandise for exportation to the United States at the ex-factory unit prices shown on the invoices.

The Seidler affidavit, referring to the shipments at bar from Forges, Trefileries & Pointeries de Creil, Creil, Oise, and from Trefileries Andre Jacquemin, Saucourt par Doulaincourt, Hte. Marne, respectively, to Orban via the port of Antwerp, Belgium, states:

In the case of both shipments the original purchase orders were placed with SAPET by Kurt Orban Company and transmitted by SAPET to the above named companies at their offices at the respective factories. In each instance the pur-

chase order was accepted by the company at its home office. The prices quoted and agreed upon were ex-factory and the manufacturer had no interest in or responsibility for the goods after the goods left the factory. The interest in and responsibilty for transporting the goods from the factory to the United States was solely that of the purchaser, Kurt Orban Company. * * *

As a convenience to United States purchasers SAPET customarily arranges and pays for the transportation of the merchandise from the factory to the port of embarkation and arranges and pays for loading the merchandise aboard ship. In the case of Kurt Orban Company it has been the practice of SAPET to make a fixed charge per metric ton for freight and loading expenses and to add this amount as a separate item to the ex-factory price of the merchandise on each particular shipment. This fixed charge per metric ton does not take into account the difference in actual freight charges which exist between different shipments because of different locations of the mills, nor differences in transportation charges from the mills to different ports in France, Belgium or the Netherlands. The loading charges also vary in some degree between shipments. The fixed charge per metric ton, which is added on each invoice, is based upon the probability that the actual cost will be equalized over a number of shipments. From January 1, 1957 through October 31, 1957, SAPET added a charge of $8.00 per metric ton on all types of wire sold to Kurt Orban. Experience showed, however, that this figure was too low, that actual freight and loading charges were more than an average of $8.00 per metric ton over that period. In order that SAPET might be reimbursed for the excess, the charge was raised to $11.00 per metric ton from November 1, 1957 to October 1, 1959. On the latter date SAPET's accounts disclosed that they had been reimbursed fully and the charge was then dropped back to $8.00 per metric ton until April 1, 1961, when it was raised to $9.75 per metric ton except on shipments from Bourbourg, where the charge is only $7.00 per metric ton.

Although it has been customary for SAPET to arrange for transportation from the factory to the ship, and for loading the merchandise upon the ship, it has always been possible for any purchaser, including Kurt Orban Company, to take delivery of the merchandise at the factory and arrange and pay for the transportation and loading of the merchandise directly. As a matter of fact, most United States purchasers prefer, as does Kurt Orban Company, to have SAPET arrange and pay for the transportation from the factory to the ship and for loading the merchandise aboard ship. This service is performed by SAPET solely for the convenience of the purchaser. SAPET attempts to recover from the purchaser only the amount actually expended for transportation and loading. The actual charges, of course, are paid in the currency of France, Belgium or the Netherlands, as the case may be. The fixed rate of either $8.00 or $11.00 per metric ton was applicable to shipments transported by water to the seaport. * * * In no case does the manufacturer of the merchandise receive any part of the charges made for transportation and loading. In all cases, including the two Kurt Orban shipments previously referred to in this affidavit, the purchaser's obligation to the manufacturer is fully satisfied by remittance of the ex-factory price shown on the invoices, and it is this amount that is turned over to the manufacturer by SAPET after payment by Kurt Orban or other purchaser.

The risk of loss or damage to the merchandise after it leaves the factory falls upon the purchaser and it is he who insures the goods from the time they leave the factory.

* * * The fixed rate of $8.00 or $11.00 per metric ton was arrived at by SAPET purely for the convenience of our customers and ourselves. By making this fixed charge per ton, it is possible for SAPET to bill for transportation and

loading charges at the same time that the invoice for the merchandise is made out. The invoice is generally made out prior to the actual expenditure of the particular charges involved and in some cases before the exact amount of such charges is known in the Paris office. SAPET has never intended to bear any of these costs itself, nor to make any profit from the fixed charge made to the purchaser. It is for this reason that the fixed charge has been adjusted from time to time in the light of actual experience. In no instance, however, has the fixed charge for transportation and f.o.b. charges been related to the ex-factory price of the merchandise, nor to changes which have occurred from time to time in the ex-factory prices of the merchandise itself.

We have quoted the affidavit at length because we agree with the statement of the single judge that "The affidavit of Seidler is very comprehensive and informative, and it is difficult to abbreviate it without omitting relevant facts."

The witness Ross testified in conformity to the method of doing business outlined by M. Seidler and although he said some things about getting price quotations on an f.o.b. port basis it is not clear what he meant by it. The important thing is that he testified to having bought from SAPET principals on an f.o.b. factory basis, to having handled inland freight through another forwarder, Salf, to having insured the purchased merchandise from the time it left the factory, to having paid additional transportation charges within Europe where it was necessary to use rail rather than barge, the latter being the mode of transport normally contemplated by SAPET in fixing its charge. In all cases Orban was in control of the source of the merchandise, which was not SAPET as the opening portion of the cross-examination of Ross shows:

XQ. Mr. Ross, would you repeat for us the method of operation you use when you make an inquiry of SAPET or when you get an order here in the United States to be placed abroad? A. Yes, sir. I evaluate the material for its specific tensile, galvanization requirement. Then I decide where we should place such an order. If I decide on one of the SAPET mills then I telex this information to SAPET, and ask SAPET to give me a specific offer from a specific SAPET mill. In no case do I leave it to SAPET to arbitrarily book such an order with any of their mills without my specific knowledge where the order is booked.

XQ. So then if you place an order with SAPET for wire to be manufactured by Jacquemin then he must ship you wire made by Jacquemin? A. Absolutely.

XQ. And he cannot say he couldn't get the merchandise from Jacquemin, so he got it from Hadir? A. He could say that he cannot get the material from Jacquemin, and ask for our permission to book it elsewhere.

XQ. But that always must be he must get your permission first? A. Yes, sir.

On consideration of the evidence as a whole, including affidavit, oral testimony, and documentary, we are unable to find substantial support for the Appellate Term's conclusion that the principal market was Paris, where only SAPET was located, or that the merchandise

was sold f.o.b. Antwerp in pricing it. In our opinion in *Mottola*, supra, we said:

In the instant case, as in the *Straub* case, the merchandise was offered *only* at a price which included the inland freight charges. Under such circumstances, as was held in the *Straub* case, those charges are inseparable from the unit value and purchase price * * *.

To bring the instant case within the law of the *Straub* and similar cases it would be necessary to find, as cannot be done here, that the wire was offered *only* at a price which *included* inland freight charges. Oddly, the Appellate Term appears to have omitted making such a finding of fact. Furthermore, its findings of fact 5 and 6 both refer to "ex-factory prices," the former stating that the factories sent invoices to SAPET on that basis and the latter stating that SAPET prepared an invoice "showing the ex-factory price" and "added as a single item to the ex-factory price" the $8 or $11 for inland freight and f.o.b. port charges. This is entirely consistent with SAPET acting as the representative for Orban in collecting transportation charges.

Being unable to find any basis in the evidence or the law for the judgment of the Appellate Term, it is *reversed*.